**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4329
_____

FRIENDS OF ANIMALS, A Connecticut Non-Profit Organization;
COMPASSION FOR ANIMALS, RESPECT FOR THE ENVIRONMENT,
A Pennsylvania Non-Profit Organization,
Appellants

v.

UNITED STATES NATIONAL PARKS MIKE CALDWELL, In Official capacity
as Superintendent of Valley Forge National Historical Park;
UNITED STATES NATIONAL PARKS SERVICE, An Agency of the U.S.;
KEN SALAZAR, In His Official Capacity as the Secretary of the Interior;
JON JARVIS, In his Official Capacity as Director of the National Park Service;
DENNIS REIDENBACH, In his Official Capacity as Regional Director for the
Northeast Region of the National Park Service
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 09-cv-05349)
District Judge:  Honorable Mitchell S. Goldberg
_____

Submitted Under Third Circuit LAR 34.1(a)
June 20, 2011
_____

Before: BARRY, AMBRO and COWEN, <u>Circuit Judges</u>

(Filed: June 27, 2011 )
_____

OPINION
_____

BARRY, Circuit Judge

Appellants, relying on the National Environmental Policy Act ("NEPA") and the Administrative Procedures Act ("APA"), challenge the procedures used by the National Park Service ("NPS") to conclude that a massive deer cull involving sharpshooters was the best option for preserving vegetation in Valley Forge National Historical Park ("Valley Forge Park"). The District Court found no error, and we will affirm.

I.

Valley Forge Park is located in rapidly growing suburbs eighteen miles northwest of center city Philadelphia. The park is overrun with white-tailed deer. Between 1983 and 2009, the deer density in the park increased from 31 to 35 deer per square mile to 241 deer per square mile. The deer voraciously eat vegetation within the park, and estimates of the appropriate deer density for maintaining natural forest regeneration range from 10 to 40 deer per square mile.

Following a three-year study and the proper publishing of notices, distribution of a draft environmental impact statement ("EIS"), and public meetings and public comment periods on the issue, the NPS published a final EIS on August 28, 2009, as required by NEPA, 42 U.S.C. § 4321 *et seq.* The EIS identified as its objectives, in relevant part, the protection and restoration of native plant communities and the cultural landscape through the reduction of deer browsing, and the maintenance of the white-tailed deer population within the park in a manner that allowed for restoration of native plants.

The NPS focused on four alternatives for accomplishing these goals. Alternative A was dubbed "No-action," and called for a continuance of the then-in-place deer management and monitoring efforts. Alternative B, "Combined Nonlethal Actions," included a proposal for rotational fencing of selected forested areas, in conjunction with the introduction of a chemical reproductive control agent, when an effective chemical agent became available on the market. Alternative C, "Combined Lethal Actions," included direct reduction of the deer population through the use of sharpshooters. Alternative D, "Combined Lethal and Nonlethal Actions," involved the use of sharpshooters to immediately reduce the deer population, plus the use of chemical reproductive controls to maintain the population size once an acceptable agent became available. The NPS chose Alternative D. The agency estimated that it would take four years to achieve its deer density goal.

The EIS briefly summarized other options that the NPS considered and then rejected. Under the heading "Reintroduction of Predators," the EIS first discussed the unsuitability of introducing wolves or cougars. It then noted that

> [m]oreover, the park is surrounded by developed areas and the proximity to humans is not appropriate for the reintroduction of large predators. Coyotes (*Canis latrans*) are present in the park and bobcats (*Lynx rufus*) potentially could be supported by habitats within the park. However, these predators have been shown not to exert effective control on white-tailed deer populations (Coffey and Johnston 1997). Based on these reasons, the reintroduction of predators was dismissed as a management option.

*Id.* at 214.

3

Appellants (the Connecticut-based non-profit Friends of Animals, and the Pennsylvania-based non-profit Compassion for Animals, Respect for the Environment (hereinafter, "FOA")) filed a complaint on November 12, 2009, and the NPS agreed to stay the deer cull for the 2009-2010 winter season. In April 2010, FOA moved to supplement the administrative record with three studies related to coyotes and their feeding and human-interaction habits, and moved for summary judgment. The NPS cross-moved for summary judgment. On October 5, 2010, the District Court denied FOA's motion to supplement the record. On October 26, 2010, after the NPS announced its plan to commence the deer cull in winter 2010, FOA moved for a preliminary injunction. The next day, the District Court denied FOA's motion for summary judgment and granted the NPS's motion, and denied FOA's motion for a preliminary injunction as moot. This appeal followed.

## II.

We have jurisdiction under 28 U.S.C. § 1291. When reviewing an administrative agency's final decision under § 706 of the APA, "we review the district court's summary judgment decision de novo, while applying the appropriate standard of review to the agency's decision." *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 693 (3d Cir. 1999) (citation and internal quotation marks omitted). Under NEPA, "an agency decision 'to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement requires the court to determine whether

4

all necessary procedures were followed, to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion.'" *Id.* at 705 (quoting *Concord Twp. v. United States*, 625 F.2d 1068, 1073 (3d Cir. 1980)). NEPA "has a specialized standard of review for arbitrariness: In deciding whether the agency acted arbitrarily, we will not substitute our own judgment for that of the agency, but we will insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 377 (6th Cir. 2010) (citation and internal quotation marks omitted). We presume that the agency action is valid, and the burden of proof "rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

NEPA "serves procedural rather than substantive goals. It does not require agencies to achieve particular substantive environmental results, but requires them to collect and disseminate information about the environmental consequences of proposed actions." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 338 (6th Cir. 2006) (citations and internal quotation marks omitted). NEPA "requires the [agency] to consider only 'reasonable' alternatives in the EIS." *Concerned Citizens Alliance*, 176 F.3d at 705. "[W]here the agency has examined a breadth of alternatives but has excluded from consideration alternatives that would not meet the goals of the project, the

5

agency has satisfied NEPA." *Id.* at 706. We review an agency's "reasonableness"

determination "with considerable deference to the agency's expertise and policy-making

role." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

FOA argues that (1) the NPS failed to adequately consider the reasonable

alternative of increasing the local coyote population; (2) the EIS contained false

alternatives that presented the NPS with only one viable option; and (3) the District Court

gave undue deference to the NPS without properly reviewing the administrative record.

Additionally, FOA argues that adequate judicial oversight was impossible without

supplementation of the record.

### A.

### i.

FOA argues that the NPS did not follow NEPA requirements when it failed to

consider increasing the coyote population as a reasonable alternative. This argument

raises the issue of how an agency determines when an option is "reasonable," an issue we

addressed in *Concerned Citizens Alliance*, 176 F.3d at 705-06.

There, the question was whether the U.S. Department of Transportation violated

NEPA by "failing to evaluate in detail an alternative" to building a bridge that directed

traffic through an historic district. *Id.* at 690. The defendants considered but did not

perform a detailed study of the plaintiffs' desired alternative—building a second bridge in

an alternate location—because defendants "deemed that alternative unreasonable." *Id.* at

692. In determining that the plaintiffs' alternative was not feasible, the defendants had conducted a study of local drivers, concluded that the alternative was financially unreasonable, determined that the alternative created new environmental problems, and decided that building a second bridge was unnecessary to fulfill the goals of the project. *Id.* at 703-04. We noted that "[t]here is necessarily a limit to the thoroughness with which an agency can analyze every option," and we concluded that "the defendants adequately considered the [second bridge] alternative and its attendant flaws before rejecting it as infeasible." *Id.* at 706. We also noted that "plaintiffs have not offered a 'specific, detailed counterproposal that had a chance of success.'" *Id.* (quoting *City of Angoon v. Hodel*, 803 F.2d 1016, 1022 (9th Cir. 1986)).

In rejecting the option of coyote predation, the NPS seems to have relied principally—if not wholly—on a 1997 study stating that coyotes could not consistently control white-tailed deer populations. App. at 362. Based on that study, "the reintroduction of predators was dismissed as a management option." *Id.* at 214. We must evaluate the NPS's choice of alternatives in light of the stated objectives of the action. "[A]n alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not bring about the ends of the federal action." *City of Alexandria*, 198 F.3d at 867.

The NPS's primary objective was to protect the native plants and landscape of Valley Forge Park, and it determined that a deer density of 241 deer per square mile had

7

"direct and indirect negative impacts on plant and animal communities." App. at 184. Accordingly, any reasonable alternative would have to result in the reduction of the deer population or in the prevention of such a high density of deer from accessing the vegetation and landscape. The 1997 Coffey and Johnston study cited by the NPS in the EIS found that coyotes could not even "consistently control[]" a white-tailed deer population, not to mention succeed in reducing the deer population to target levels.[1] The NPS clearly researched, and rejected, the idea of reducing the deer population through the use of predators. It may have relied on only one study. But with no evidence suggesting that an enhanced coyote population could reduce the white-tailed deer population in Valley Forge Park, and with evidence stating exactly the contrary, the NPS did not err in concluding that coyote predation was not a reasonable alternative and did not require further study. *Concerned Citizens Alliance*, 176 F.3d at 706.[2]

Further, although not dispositive, we noted in *Concerned Citizens Alliance* that the plaintiffs did not offer a detailed counterproposal to the agency's preferred option "that had a chance of success." *Id.* That is also the case here. FOA sought to add to the record certain studies relating to coyote predation and coyote-human interactions. The District

---

[1] The record contains portions of two other studies, not cited in the EIS, supporting the conclusions of the Coffey and Johnston study, although it is unclear whether the NPS relied on those studies. *See id.* at 366; *id.* at 372.

[2] FOA argues that the NPS never actually considered the option of *enhancing* the coyote population because the EIS subchapter discussing coyotes was titled "Reintroduction of Predators," and coyotes already existed in Valley Forge Park. Even assuming that FOA is correct, our analysis is unchanged because the available evidence suggested that coyotes cannot reduce the deer population.

Court did not consider them, but we have, and it is clear that two of the studies *support* the NPS's conclusion that coyotes could not reduce the white-tailed deer population in Valley Forge Park. *See* App. at 37; *id.* at 126.

The Federal Regulations governing the NPS's actions required the agency to "[r]igorously explore . . . all reasonable alternatives" and only "briefly discuss the reasons" for eliminating other options from detailed study. 40 C.F.R. § 1502.14(a). The NPS adequately considered and appropriately rejected the option of coyote predation because there was not a shred of evidence that such an option could achieve the NPS's stated goals. The NPS's determination on this issue was neither arbitrary nor capricious.

ii.

FOA contends that alternatives A and B were no more than "straw men," and that the NPS from the beginning preferred to "shoot the deer," Appellants' Br. at 18, the options available in alternatives C and D. NEPA requires federal agencies to study in detail all reasonable alternatives to actions significantly affecting the quality of the human environment. 42 U.S.C. §§ 4332(2)(C)(iii), (E); 40 C.F.R. §§ 1502.1, 1502.14(a). Other circuits "have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174-75 (10th Cir. 1999) (citing cases from the Seventh and D.C. circuits). However, NEPA does not mandate particular results, and courts "only consider whether an agency's decisions

9

regarding which alternatives to discuss and how extensively to discuss them were arbitrary, keeping in mind that such decisions are necessarily bound by a rule of reason and practicality." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) (citations and internal quotation marks omitted). The goal of court review "is to ensure that the agency gathered information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Id.* (citation and internal quotation marks omitted).

The record indicates that the NPS engaged in a lengthy and reasoned review process before focusing on alternatives A, B, C, and D and ultimately choosing Alternative D. As an initial matter, FOA's arguments regarding Alternative A as being only a false alternative fall flat; federal regulations required the NPS to include Alternative A, the "No-action" alternative, in the EIS. 40 C.F.R. § 1502.14(d). As to Alternative B, "Combined Nonlethal Actions," the NPS met internally to discuss management of the white-tailed deer population beginning in September 2006. The results of those meetings were discussed in a Final Internal Scoping Report, which shows that NPS considered the nonlethal options of chemical reproductive control, fencing of targeted areas or the entire park, the "hazing" or frightening of the deer, translocation, the use of chemical repellents, and supplemental feeding to reduce damage to the natural vegetation. *Id.* at 267-71. The NPS also formed two scientific teams to review and discuss deer management options and conditions at the park. *Id.* at 175. It held several

10

public meetings on its deer management plan and received thousands of comments, and released the final EIS after a three-year process of internal review and public comment. Even if alternatives C and D were more viable options than Alternative B by the time the NPS prepared the final EIS, the record reflects that the NPS seriously considered options other than using sharpshooters to kill the deer. The NPS included a reasonable range of alternatives and did not violate the requirements of NEPA.

iii.

FOA contends that the District Court failed to conduct a "probing review" of the record to determine whether the NPS followed NEPA's procedural requirements. FOA relies principally on *Olenhouse v. Commodity Credit Corp.*, a non-NEPA case from the Tenth Circuit. 42 F.3d 1560, 1565-66 (10th Cir. 1994). There, instead of reviewing the administrative record itself, the district court concluded that the record supported the agency's action based on "counsel's statements as to what was in the record and material appended to the government's 'Motion to Affirm'" and "isolated bits of this second hand 'evidence.'" *Id.* at 1565. The court also supplied reasons for the agency's decision which were not contained in the record and which the agency asserted for the first time in the district court. *Id.* at 1576. The Tenth Circuit determined that the court's reliance on evidence outside the administrative record was error, and it reviewed the record itself and reversed. *Id.* at 1579-80, 1584.

Even if the District Court's analysis in this case focused on its conclusion that

11

increasing the number of coyotes in an urban park environment was against "common sense," App. at 17, rather than focusing on the EIS's stated reasons for rejecting coyote predation, its approach is far different from the district court's in *Olenhouse*. Here, it is clear that the District Court reviewed the record, albeit substituting its own "common sense" interpretation of the NPS's decision (or, at a minimum, accepting a "common sense" argument by the NPS that was not part of the administrative record). That "error," if it is such, does not require remand, as our review permits us to conclude that the NPS complied with NEPA in determining that coyote predation was an unreasonable alternative. *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc) ("We may affirm the District Court on any grounds supported by the record."); *see also Olenhouse*, 42 F.3d at 1580 (declining to vacate and remand district court order and choosing to review the record and rule on the merits at the circuit level).

B.

FOA argues that the District Court should have granted its motion to supplement the record with three studies addressing coyote hunting habits and tendencies in human interactions. We will review a district court's decision to reject or admit evidence outside of the administrative record for abuse of discretion. *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 16 (2d Cir. 1997).

The APA requires a court reviewing an agency action to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The Supreme Court has held that

12

"the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). FOA argues that certain circuits have adopted a more permissive approach to allowing extra-record review in NEPA cases. *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004); *Nat'l Audubon Soc'y*, 132 F.3d at 14-15; *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). We have not addressed whether a specific NEPA exception applies, and we will not do so here. FOA's proposed extra-record evidence either (a) does not conflict with the NPS's findings; or (b) is irrelevant because the EIS focuses on the failure of coyotes to control the deer population, not on the issues surrounding human-coyote interactions. Because the record discloses the factors considered by the NPS in rejecting coyote predation, and because FOA's proposed record additions do not conflict with those factors, there is no reason to supplement the administrative record.

III.

We will affirm.