**CONCERNED CITIZENS COALITION**

v.

**FEDERAL HIGHWAY ADMINISTRATION**

No. CIV.A.6:04 CV 329.

United States District Court,
W.D. Louisiana.

Aug. 8, 2004.

Karla Ann Raettig, Tulane Environmental Law Clinic, New Orleans, LA, for Concerned Citizens Coalition, Plaintiff.

James L. Nelson, U.S. Attorneys Office, Baton Rouge, LA, Janice E. Hebert, U.S. Attorneys Office, Lafayette, LA, John J. Gaupp, U.S. Attorneys Office, Baton Rouge, LA, Linda J. Amidon, Fed. Hwy. Admin, Michelle O. Sayyar, Fed. Hwy. Admin., Atlanta, GA, for Federal Highway Administration, Defendant.

## MEMORANDUM RULING AND JUDGMENT

MELANCON, District Judge.

Defendant Federal Highway Administration ("FHWA") moves for summary

judgment on the grounds that it has complied with federal law in reaching its decision to build an elevated expressway through Lafayette, Louisiana. [Rec. Doc. 13]. Defendant seeks dismissal of plaintiff's complaint. Plaintiff Concerned Citizens Coalition has filed a cross-motion for summary judgment [Rec. Doc. 16], seeking declaratory relief and to enjoin the project's developers from continuing with construction of the project. Plaintiff has submitted a memorandum in opposition to defendant's motion [Rec. Doc. 24] and defendant has submitted a memorandum in response to plaintiff's cross-motion [Rec. Doc. 23], to which plaintiff has submitted a reply. [Rec. Doc. 29]. For the following reasons, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

### Background

On April 15, 2003, plaintiff Concerned Citizens Coalition filed suit against the Federal Highway Administration ("FHWA") in the United States District Court for the Middle District of Louisiana, seeking declaratory relief and a permanent injunction halting the construction of the proposed I–49 Connector project in Lafayette, Louisiana. R. 1, ¶ 1–12. The suit was transferred to the United States District Court for the Western District of Louisiana on January 27, 2004. R. 30. Plaintiff is a Louisiana non-profit corporation comprised of residents of Lafayette, Louisiana, whose stated purpose is to "protect and improve the quality of its members' environment and neighborhoods, including Sterling Grove and the other

neighborhoods that will be adjacent to the I–49 Connector." R. 1, ¶ 5. Defendant Federal Highway Administration is an agency of the federal government which administers federal aid to the states for the construction of highway projects, and as such is the lead agency in developing the I–49 Connector.[1] Id.

The subject of this action is the I–49 Connector Project, hereinafter "the project", which, if constructed, would consist of approximately five miles of new freeway in Lafayette, Louisiana, lying generally along the existing Evangeline Thruway Corridor. See Final Environmental Impact Statement ("FEIS"), Vol. I. The project would run from just south of the Lafayette Regional Airport, continuing north to the southern terminus of the I–49 at the I–49/I–10 exchange. Id., at S–1. The project has been under consideration since 1987, when Congress authorized and funded a study of a highway project designed to provide access between an interstate route and a federal-aid highway on the primary system in Lafayette. Id. In 1992, the FHWA, in concert with the Louisiana Department of Transportation and Development ("LaDOTD"), circulated a Draft Environmental Impact Statement (DEIS) that proposed constructing a highway along the U.S. 90/U.S. 167 Evangeline Thruway Corridor.[2] Id.

Subsequently, the Lafayette Areawide Planning Commission, a municipal planning agency, developed a study known as the "Lafayette North–South Corridor Study Path to Progress." FHWA Record of Decision ("ROD"), at A–59. The "Path

---

1. As the lead agency responsible for approving state transportation projects for federal funding, FHWA is required to ensure compliance with federal statutes and regulations, including, but not limited to, the National Environmental Policy Act (NEPA) 42 U.S.C. § 4321, et seq., Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, and

the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, et seq.

2. Pursuant to 23 C.F.R. § 771.109, state highway agencies such as LaDOTD are authorized to prepare environmental impact statements, with the FHWA providing guidance and independent evaluation.

to Progress Study" evaluated four alternative freeway corridors as well as a no-build alternative, and ultimately recommended a freeway on the Evangeline Corridor in lieu of several by-pass alignments, which were rejected on the basis that they did not achieve the goal of improving traffic flow in the vicinity of the Evangeline Thruway. *Id.* In 1997, the FHWA and the LaDOTD began a second draft Environmental Impact Study. The EIS identified the need for and purpose of the project as follows:

Link the interstates 1–49 and 1–10 north of Lafayette to U.S. 90 and U.S. 67 with full freeway services to the Lafayette Regional Airport and the downtown multimodal transit center, Beaver Park, the CBD [Central Business District], University Avenue Extension and Verot School Road Extension.

Relieve existing and projected traffic in existing Evangeline Thruway Corridor.

Meet long standing regional plans which have identified a need for a freeway in the Evangeline Thruway Corridor.

Meet intent of original enabling federal legislation for project.

Improve highway safety in the Corridor.

Improve hurricane evacuation by eliminating the choke point on U.S. 90 in Lafayette.

Increase mobility in the capacity of the Evangeline Thruway Corridor which will attract traffic from other congested roads, thus improving mobility in the region.

ROD, at 3.

The second draft EIS included a revised set of six alignment alternatives. The six alternatives included four alignments retained from the 1991 DEIS, including four variations on an Evangeline Thruway alignment, as well as a no-build alternative. FEIS, at 2–3.[3] The two below-grade depressed alignments from the DEIS were rejected on the basis of hydraulic unfeasibility, and replaced with two "selected overpass" alternatives. *Id.* All six alternatives followed the same general path along the Evangeline Thruway alignment between the Union Pacific Railroad Spur and the existing I–10/I–49 Interchange. *Id.* The difference between the elevated and "selected overpasses" alternatives is in design of the project within the length of the corridor between Pinhook Road and the Union Pacific Spur (referred to in the record as the "core area"). *Id.* The elevated alternatives would run continuously on a ridge through this area, with arterial cross streets remaining open to traffic below. FEIS, at 2. The selected overpass alternatives would be at grade in this core area, with overpasses at Pinhook Road, Johnston Street, and Mudd Avenue. *Id.* Other cross-streets would be severed and closed by the freeway. *Id.* Outside of this core area, the elevated and selected overpasses alternatives are virtually identical. *Id.*

Between the commencement of the second draft EIS in 1997 and through 2002, LaDOTD and FHWA evaluated the potential effects of these alternatives on the surrounding areas, addressing direct and cumulative impacts on neighborhoods, public facilities, recreational facilities, cultural resources, noise, wetlands, waste sites, water resources, environment, traffic, and historic sites. FEIS, at 6–1. In November 2000, the draft EIS was released and circulated in accordance with 23 C.F.R. § 123(g). FEIS, at 5–4. A formal public hearing was conducted on December 14, 2000, pursuant to 23 C.F.R. § 770.111. *Id.* The Concerned Citizens Coalition responded to the draft by raising the existence of reasonable alternatives that had not been

---

3. The six "build" alternatives were identified as (1) EA–1 Elevated; (2) EA–1 Selected Overpasses; (3) RR–1 Elevated; (4) RR–3 Selected Overpasses; (5) RR–4 Elevated; and (6) RR–5 Elevated. FEIS, at 2–3.

included in the EIS, including the East and West bypasses and the Teche Ridge Alternative.[4] *R. 16,* at 4. Concerned Citizens also contended that the Administration had failed to direct sufficient study to public transportation as an alternative method of meeting the project's "purpose and need [5]" of relieving traffic congestion within the Evangeline Corridor. *Id.*

The final Environmental Impact Study was released on August 30, 2002. FEIS, at S–1. In the final EIS, the FHWA selected the "RR–4" alternative as the "preferred alternative." *Id.,* at 2–37. RR–4 is an elevated highway which uses parts of the existing Evangeline Thruway alignment. *See id.* Plaintiff submitted timely comments on the final EIS in October 2002, contending that feasible and prudent alternatives to RR–4 had been improperly excluded from the final EIS, and that the FHWA had failed to consider impacts on historic properties and parkland, in violation of Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C)(iii), and the National Historic Preservation Act (NHPA), 16 U.S.C. § 470(f).

*Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Little v. Liquid Air Corp.,* 37 F.3d 1069 (5th Cir.1994)(en banc). When a party seeking summary judgment bears the burden of proof at trial, it must come forward with

evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

Once the movant produces such evidence, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial. *Id.* The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Little,* 37 F.3d at 1075. If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

*Standard of Review*

Under the Administrative Procedure Act, 5 U.S.C. § 706, "a court's review of a challenge to an administrative decision is limited to scrutiny of the record for the existence of errors of law or absence of

---

4. The Teche Ridge alignment proposed by plaintiff would route I–49 to east of Lafayette, through St. Martin Parish, forming a "loop." Comments to FHWA on Behalf of Concerned Citizens Coalition, at 1. In 1995, the Metropolitan Planning Organization recommended no study of the Teche Ridge Alignment, on the basis that this alignment could not meet the purpose and need of the project by relieving traffic pressures along the Evangeline Thruway. *Id.,* at 2.

5. The "purpose and need" of the project is set out in Chapter One of the Final EIS.

reasoned consideration of the record to support the factual conclusions reached by the agency." The appropriate standard for judicial review of an administrative agency's action is whether the agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). A court's review of whether an agency's decision was arbitrary and capricious "must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ Where the review of an agency decision involves an interpretation of law, an agency's interpretation of its own rules must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The agency's interpretation of its rules "need only be reasonable, and not the only interpretation or the one the court would have reached if it was initially faced with the question." *Enron Oil & Gas Co. v. Lujan,* 978 F.2d 212, 215 (5th Cir.1992). A reviewing court may not substitute its own judgment for that of the agency. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 555, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

### Analysis

#### A. Plaintiff's Section 4(f) Claims

Plaintiff claims that the Federal Highway Administration violated Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138, by approving the use of a park and several historic sites without first finding that there are no "reasonable and prudent alternatives" to the use of these sites. *R. 16,* at 6. Section 4(f) provides that the Secretary of Transportation may approve a transportation project requiring the *use* of publicly owned land of a public park, recreation area, wildlife refuge, or land of a historic site of national, state, or local significance only if (1) there is no prudent and feasible alternative to using that land; and (2) the project includes all possible planning to minimize harm from the use. 49 U.S.C. § 303.[6]

Plaintiff claims that the FHWA's determination that the project does not "use" property protected by Section 4(f) is in violation of controlling caselaw and the agency's own rules. *R. 16,* at 6–11. It is undisputed that several parks and historic sites lie within the vicinity of the proposed project. The parkland properties which fall within the purview of Section 4(f) include Beaver Park, Lilwoods Playground, and Jean Lafitte National Historical Park. *R. 13,* at 22, citing 23 C.F.R. § 771.135(p)(1). The historic sites protected by Section 4(f) include several properties listed on the National Register of Historic Places, including the Sterling Grove National Historic District, Charles H. Mouton House, and the Evangeline Hotel. *Id.* Plaintiff also contends that Section 4(f) protection applies to eight properties which are eligible for inclusion on the National Register, including Caffery House, Heymann Department Store, Sans Souci, Good Hope Hall, N.P. Moss School, Trappey's Plant Complex, and the Wallis Estate. *Id.*

In its Record of Decision, the FHWA determined that Section 4(f) regulations were inapplicable to the parks and historic sites within the vicinity of the project, because the project will not use the protected properties. ROD, at 21 & 27. The conclusions that an agency reaches in the section 4(f) process are subject to a "thor-

---

6. The FHWA regulations implementing Section 4(f) are found at 23 C.F.R. § 771.135.

ough, probing, in-depth review." *Citizen Advocates for Responsible Expansion (I–CARE) v. Dole,* 770 F.2d 423, 441 (5th Cir.1985), citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If it is determined that the project does not use Section 4(f) properties, then the agency's duties with regard to the statute are met. *Citizens to Preserve Overton Park,* 401 U.S. at 411, 91 S.Ct. 814. The Court's first task is to determine whether the Secretary properly followed Section 4(f) procedure in concluding that the I–49 Connector would not "use" Section 4(f) properties.

The Section 4(f) regulations, found at 23 C.F.R. § 771.135, define "use" for the purpose of the Section, stating that use occurs when: (1) land is permanently incorporated into a transportation facility; or (2) when there is a constructive use of land. "Constructive use occurs when the project does not physically incorporate land from a Section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under Section 4(f) are substantially impaired." *Id.* § 771.135(p)(2). In this case, FHWA determined that neither actual use nor constructive use of protected Section 4(f) land would occur, and therefore the Section did not apply. ROD, at 21 & 27.

Plaintiff argues that FHWA's conclusion that the project would not use Section 4(f) sites, thereby excluding the project from Section 4(f) consideration, was in violation of the Administrative Procedures Act, 5 U.S.C. § 704, *et seq.* In its memorandum in support of its motion for summary judgment and its memorandum in opposition to defendant's cross-motion for summary judgment, plaintiff discusses the applicability of the Section to each of the properties which qualify for Section 4(f) consideration: Beaver Park, Sterling Grove National Historic District, and the

Wallis Estate. *R. 16,* at 6–11. The Court will address plaintiff's discussions of the applicability of Section 4(f) to each of these sites.

### a. Beaver Park

Plaintiff argues that Section 4(f) is applicable to Beaver Park because the project will involve both actual use and constructive use of the park. *R. 16,* at 8. In an attempt to allege that the I–49 Connector will "actually use" Beaver Park, plaintiff contends that "[T]he I–49 Connector will run directly through the Park, which is actual physical use." *Id.* This statement is a reference to the fact that the Evangeline Thruway already runs through the park via an existing right-of-way owned by La-DOTD. *See* ROD, at A–29. The FEIS also states that "[N]one of the alternatives of the proposed project will require the acquisition of any parkland." FEIS, at 4–40. Because parkland will not be taken in order to build the project, no support exists for plaintiff's contention that actual use of Beaver Park will occur.

■ Plaintiff argues that the project will make constructive use of Beaver Park, stating that increased noise and visual blight will constitute severe proximity impacts which will substantially impact the property. *R. 16,* at 9. Plaintiff directs the Court's attention to the final EIS, which acknowledges that "noise and visual effects will occur at Beaver Park" but contends that these effects "do not substantially impact the 4(f) property." FEIS, at 4–41. In support of this contention, plaintiff alleges that increased noise levels will result in constructive use. *R. 16,* at 9.

The Record of Decision includes the results of a noise study which found that increased noise levels would occur as a result of the project. ROD, at 12–14. Noise levels in Beaver Park were projected to increase from 71 dBA to 75 dBA.

FEIS, at 4–41. Based on the study, defendant determined that the noise increase would not substantially impair or alter the purpose of the park, and therefore no constructive use would occur. *Id.*

Plaintiff alleges that the applicable Section 4(f) regulations do not support FHWA's decision that the noise effects of the project will not have a substantial impact on the park. *R. 16,* at 9. In support of this contention, plaintiff cites a "3 dBA or less" standard for avoiding constructive use. *Id.,* citing 23 C.F.R. § 771.135(p)(5)(iii). This regulation states that "a constructive use does not occur when the projected noise levels exceed the relevant threshold in paragraph (p)(5)(ii) of this section because of high existing noise, but the increase in the projected noise levels if the proposed project is built is barely perceptible (3 dBA or less)." 23 C.F.R. § 771.135(p)(5)(iii). Plaintiff argues that, because defendant admits that the noise level at Beaver Park will be increased by four decibels (from 71 dBA to 75 dBA), the noise level increase will result in constructive use of the park. *R. 16,* at 9.

Defendant responds that the regulation plaintiff cites provides only one example of when constructive use does not occur, and that no FHWA regulation states that a projected noise level increase of over 3 dBA constitutes a constructive use. *R. 23,* at 6, citing 23 C.F.R. § 771.135(p)(5)(iii). The Court construes this excerpt of 23 C.F.R. § 771.135(p)(5)(iii) as a description of one situation in which the agency will not find constructive use. This regulation does not set out a definitive "standard" for finding constructive use, as plaintiff argues. *See R. 16,* at 9. Indeed, because of the existing Evangeline Thruway, Beaver Park is already considered impacted under the FHWA noise regulations, since the current noise level of 71dBA is higher than the 67 dBA standard which the FHWA considers as the upper limit for noise in park areas. *See* Table 1, 23 C.F.R. § 772.12.

Defendant contends that its assessment that the minor projected noise increase would not substantially alter or impair the purpose of the park was proper, and based on adequate evidence in the administrative record. *R. 23,* at 7.

Based on the record of defendant's decision as to the impact of the projected noise level increase on Beaver Park, the Court finds that proper procedure was followed in assessing the project's noise impacts on the park. Plaintiff has failed to demonstrate that FHWA's actions in making this determination following its noise level studies rose to the level of being arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. The Court therefore finds that defendant's determination that the project will not require the constructive use of Beaver Park must stand.

*b.  Sterling Grove National Historic District*

■ Next, plaintiff argues that FHWA's decision that Section 4(f) does not apply to the Sterling Grove National Historic District ("the District") ignores the agency's own regulations and violates settled case-law. *R. 16,* at 10. The Sterling Grove Historic District is listed on the National Register of Historic Places. FEIS, at S–12, 4–44, 4–53, 4–110. The District fronts on the northbound Evangeline Thruway between Simcoe Street and Mudd Avenue, and includes St. Genevieve's Church and Elementary School. *Id.* The I–49 Connector would run approximately 280 feet from the face of St. Genevieve's Church. *Id.*

Defendant acknowledges that the project would have "an adverse visual impact on the historic district." *R. 16,* at 10, citing FEIS, at 4–44; S–12, 4–44, 4–53, 4–

110. Additionally, defendant admits that construction noise during the anticipated seven to ten years of construction of the project is expected to have "impacts upon the residences, churches, schools, and businesses that are located immediately adjacent to the project corridor." *Id.,* citing ROD, at 12. Plaintiff, citing *Citizen Advocates for Responsible Expansion (I–CARE) v. Dole,* 770 F.2d 423 (5th Cir. 1985), argues that defendant's determination that Section 4(f) does not apply to the construction of the I–49 Connector in the vicinity of the Sterling Grove National Historic District amounts to a violation of the Administrative Procedures Act. *R. 16,* at 10–11.

In *I–CARE,* several Section 4(f) properties lay in close proximity to a proposed highway widening project. *I–CARE,* 770 F.2d at 427. The plans for the project called for the demolition of one historic property, a public market building which was renowned as a rare surviving example of commercial Spanish Colonial Revival architecture. *Id.* Additionally, the expanded expressway was slated to rest only twenty feet from the steps of an historic post office. *Id.* The Fifth Circuit, reviewing the district court's decision which upheld the agency's decision that constructive use was not present in that case, opined that "it borders on the ridiculous to suggest that the [project] would have minimal impacts" on these sites. *Id.,* at 442.

The facts of the *I–CARE* case are unique and easily distinguishable from the instant case. First, the plans for the proposed I–49 Connector do not call for the demolition of any properties within the district. ROD, at 10. Second, while it is undisputed that adverse impacts will occur within the district, in the form of increased noise levels and visual blight, these impacts do not rise to the level of those in *I–CARE.* In *I–CARE,* the district court found constructive use because the pro-jected impacts of the highway project in that case were so severe that the protected activities, features, and attributes of the 4(f) resources would be *substantially impaired. I–CARE,* 770 F.2d at 442.

In this case, while the agency official has stated that adverse impacts will be present within the Sterling Grove Historic District, plaintiff has failed to come forward with sufficient evidence to demonstrate that the FHWA was arbitrary and capricious in determining that these impacts were not so severe as to invoke the constructive use doctrine of Section 4(f). It cannot be said that this interpretation of Section 4(f) was unreasonable in light of the factual findings made by the agency. *See Enron Oil & Gas Co.,* 978 F.2d at 215. The agency's determination that the project will not "use" the Sterling Grove Historic District within the meaning Section 4(f) must stand.

### c. The Wallis Estate

Plaintiff contends that FHWA incorrectly determined that Section 4(f) did not apply to the Wallis Estate, a site eligible for the National Historic Register. *R. 16,* at 12. As with its argument regarding the applicability of Section 4(k) to Beaver Park, plaintiff asserts that because "the project will increase the noise levels at the estate's main house by 7 dBA", FHWA has violated their "3 dBA or less" standard for avoiding construction use. *R. 16,* at 11; *see discussion infra* at 13–14. As the Court found in its earlier discussion as to the applicability of Section 4(f) to Beaver Park, plaintiff has failed to demonstrate that such a standard anything more than a statement of when constructive use *does not* occur and is not binding on the FHWA. Therefore, plaintiff cannot show that FHWA's determination that Section 4(f) did not apply to the Wallis Estate

violated the Administrative Procedure Act based on 23 C.F.R. 771.135(p)(5)(iii).

For the foregoing reasons, the Court finds that plaintiff has failed to establish that the agency's determination that Section 4(f) of the Department of Transportation Act does not apply to the I-49 Connector Project constitutes an action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Because FHWA has determined, in accordance with its regulations, that Section 4(f) does not apply because neither actual nor constructive use of 4(f) properties will occur, there is no need to conduct additional analysis of the agency's actions. The Court will grant defendant's motion for summary judgment on the issue of the applicability of Section 4(f) to the I-49 Connector, and deny plaintiff's cross-motion for summary judgment.

### B. Plaintiff's NEPA Claims

■ The National Environmental Policy Act directs that "to the fullest extent possible . . . all agencies of the federal government shall . . . include in every . . . major federal action significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii). The "alternatives requirement" of NEPA demands that agencies "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). The purpose of the alternatives requirement is to allow agency officials to make a "fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 558, 98 S.Ct. 1197 (1978); *Sierra Club v. Morton,* 510 F.2d 813, 825 (5th Cir.1975).

Plaintiff complains that the final EIS issued by FHWA does not contain an anal-

ysis of an adequate range of alternatives to the "RR-4" location for the I-49 Connector. *R. 16,* at 16. Specifically, plaintiff argues that the fact that FHWA only included alternatives within a five-mile strip of land renders the environmental impact statement invalid. *Id.* Additionally, plaintiff contends that defendant failed to evaluate whether improvements to public transit could meet the needs of the project by relieving traffic congestion along the Evangeline Thruway corridor, an objective which is stated as one of the main purposes of the I-49 Connector. *Id.* Plaintiff asserts that FHWA's alleged failure to consider an adequate range of alternatives to the proposed I-49 Connector is a violation of NEPA, and requests that the Court remand the matter for further evaluation of alternatives. *Id.*

■ The Court's task in regard to plaintiff's challenge of the alternatives analysis contained in the final EIS is to discern whether the agency undertook a "rigorous and thorough" evaluation of alternatives. *See Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 178 (5th Cir.2000). The procedural requirement of NEPA is limited to a requirement that the agency consider "reasonable, non-speculative alternatives." *Piedmont Heights Civic Club,* 637 F.2d at 436, citing *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 551, 98 S.Ct. 1197. Under NEPA, alternatives are to be evaluated in relation to the objectives of the proposed project, as described in the EIS. *See National Wildlife Federation v. F.E.R.C.,* 912 F.2d 1471, 1483 (D.C.Cir.1990). In the present case, FHWA has stated that a purpose and need of the project is to relieve traffic congestion along the existing Evangeline Thruway corridor. FEIS, at 1-1. Therefore, the agency's compliance with the alternatives requirement must be evaluated in relation to the purpose and need defined in

the EIS. *See City of Alexandria v. Slater,* 198 F.3d 862, 867 (C.A.D.C.1999).

■ Plaintiff challenges the adequacy of the range of alternatives included in the NEPA study by asserting that the agency failed to include the Teche Ridge Alignment or other bypass alternatives as "viable" alternatives, while failing to undertake sufficient consideration of public transit as a way to meet the project's purpose. *R. 16,* at 16. Defendant, in response, directs the Court to Chapter Two of the final EIS, in which the agency explains that the bypass alternatives were considered and withdrawn following a determination that they did not meet the project's purpose and need. *R. 13,* at 13–14. Specifically, these bypass alternatives were rejected because they did not serve the purpose of reducing traffic congestion. *Id.,* citing ROD at 4–6.

■■ It is not the role of the Court to question the agency's determination of the goals of the project in accordance with its own technical studies, the results of which are not in dispute. *Coalition on Sensible Transp., Inc. v. Dole,* 642 F.Supp. 573, 593 (D.D.C.1986), aff'd., 826 F.2d 60 (D.C.Cir. 1987). Therefore, acceptance of the statement of purpose and need of the EIS renders unnecessary any evaluation of alternatives which fail to serve the project's objectives. *See National Wildlife Federation,* 912 F.2d at 1483; *see also City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986). The final EIS need not explore remote and speculative alternatives where preliminary studies have demonstrated that the rejected proposals were unfeasible. *Tongass Conservation Society v. Cheney,* 924 F.2d 1137, 1140 (D.C.Cir.1991).

Plaintiff has not demonstrated that FHWA violated NEPA by failing to adequately examine alternatives to the proposed project. Under NEPA, an agency is not required to exhaust "every possible alternative device conceivable by the mind

of man"; rather, the agency is required to discuss reasonable and realistic alternatives. *See Vermont Nuclear Power Corp.,* 435 U.S. at 551, 98 S.Ct. 1197. Plaintiff has not shown that FHWA's failure to include either the by-pass routes or public transportation projects in the EIS analysis was unreasonable. The Court will therefore grant defendant's motion for summary judgment on the issue of the NEPA alternatives requirement, and deny plaintiff's cross-motion for summary judgment.

## C. Plaintiff's NHPA Claims

Plaintiff claims that FHWA violated Section 106 of the National Historic Preservation Act. *R. 16,* at 17. NHPA requires any federal agency with "jurisdiction over a proposed or federally assisted undertaking to . . . take into account the effect of the undertaking on any . . . site . . . that is included in or eligible for inclusion in the National Register [of Historic Places.]" 16 U.S.C. § 470f. Pursuant to 16 U.S.C. § 470s, the Advisory Council on Historic Preservation has promulgated administrative regulations which govern the review process. *See* 36 C.F.R. §§ 800.1–800.16 (2001).

These regulations provide for a four-step review process. *See id.* First, it must be determined whether the federal action is an "undertaking" which has the potential to affect historic properties. 36 C.F.R. § 800.3(a). Once it is determined that the proposed action is subject to the NHPA review process, the agency should identify the appropriate State Historic Preservation Officer (SHPO) and consult with that officer regarding the nature of the undertaking and its effects on historic properties. 36 C.F.R. § 800.3(c). Additionally, the agency must involve local governments and the public. 36 C.F.R. § 800.3(f)(1). The agency must also coordinate the NHPA planning schedule with

the review required under other authorities such as NEPA. 36 C.F.R. § 800.3(b).

In the second step, the agency is instructed to determine the Area of Potential Effects (APE) of the undertaking, through consultation with the SHPO. 36 C.F.R. § 800.4(a)(1). The "area of potential effects" is defined in the regulations as "the geographic area or areas within which an undertaking may directly or indirectly cause alteration in the character or use of historic properties, if any such properties exist." *Id.* at § 800.16(d). Once the APE is defined, the agency must review existing information regarding properties within the APE and seek additional information from consulting parties with regard to identifying additional historic properties within the APE. *Id.* at § 800.4(a)(2–3). If the agency finds that historic properties will be affected, the agency official must notify consulting parties and invite their input on the effects. *Id.* at 36 § 800.4(d)(2).

The third step requires the agency to determine whether the effects on historic properties will be "adverse", using the criteria specified in the regulations. 36 C.F.R. § 800.5(a).[7] If the undertaking is found to have an adverse effect on historic properties within the APE, the agency official shall consult further to resolve the adverse effect pursuant to 36 C.F.R. § 800.6. *Id.* at 800.5(d)(2). Finally, in the fourth step, the agency must attempt to reach agreement with order consulting parties in developing and evaluating alternatives to avoid, minimize, or mitigate adverse effects. 36 C.F.R. § 800.6. If the agency and the SHPO agree on the plan, they enter into a Memorandum of Agreement (MOA), which is submitted to the Advisory Council for Historic Preservation prior to its final approval of the undertaking. *See Friends of the Atglen–Susquehanna Trail v. Surface Transp. Bd.* 252 F.3d 246, 254 (3d Cir.2001); *Tyler v. Cuomo,* 236 F.3d 1124, 1129 (9th Cir.2000). Where an MOA is executed, it "shall govern the undertaking and all of its parts." 16 U.S.C. § 470(h)-(2).

■ In this case, the Section 106 process resulted in a MOA between the Louisiana SHPO and the FHWA. *See* FEIS Appendices E and F. However, plaintiff asserts that the Section 106 review was deficient because of the exclusion of certain historic properties from the area of potential effect. *R. 16,* at 18. Specifically, plaintiff contends that of the eleven properties that the agency considered to be

---

7. The regulations describe the type of "adverse effects" contemplated by the regulations as follows:

Examples of adverse effects. Adverse effects on historic properties include, but are not limited to:

(i) Physical destruction of or damage to all or part of the property;

(ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines;

(iii) Removal of the property from its historic location;

(iv) Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

(v) Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

(vi) Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

(vii) Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

36 C.F.R. § 800.5(a).

within the APE, only three properties were given full Section 106 consideration, and only one site was actually determined to be adversely affected by the project.[8] *Id.*, at 19. Plaintiff argues that "the Administration provided no reasons for the unsupported conclusion that the majority of historic properties, once deemed within the area of potential effects, were suddenly out of harm's way." *Id.*

Defendant responds that the record holds no evidence of a failure to comply with Section 106 regulations. *R. 23*, at 17–18. Indeed, the record reflects that all but three of the eleven historical properties included in the initial analysis were determined to be located well away from the actual project corridor, resulting in the agency's determination that no adverse effects to those properties were anticipated. *See* FEIS, Appendix E, at 10. In arguing that defendant failed to support its conclusion that these eight properties were not at risk for adverse impacts, plaintiff confuses the process of Section 106 review. The agency, in accordance with 36 C.F.R. § 800.4(a)(1), defined the project's area of potential effects (APE), and then took the next step of determining whether the properties within the APE would be subjected to any conditions that met the regulation's definition of "adverse impacts." 36 C.F.R. § 800.5(a). The agency eliminated the eight properties from Section 106 consideration only after receiving input from consulting parties, and then recording its finding that these sites were not threatened as per the terms of the regulations. *R. 23*, at 17–18.

The Court, having reviewed the final EIS and the MOA, finds that plaintiff has not put forward evidence that the agency's failure to find an adverse effect on eight of the eleven properties studied constitutes a decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The record demonstrates that through the MOA, the agency, in consultation with the Louisiana SHPO and ACHP, considered the project's adverse effects and adopted a mitigation plan. *See* FEIS, Vol. II, MOA. The Court thus finds that defendant has fulfilled its requirements with respect to the Section 106 process. The Court will therefore grant defendant's motion for summary judgment on the issue of FHWA's compliance with Section 106 of the National Historic Preservation Act, and deny plaintiff's cross-motion for summary judgment.

### D. Plaintiff's Request for Preliminary Injunction

There are four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction: 1) a substantial likelihood that the plaintiff will prevail on the merits; 2) a substantial threat that the plaintiff will suffer irreparable injury if the relief is not granted; 3) the threatened injury outweighs the threatened harm that the relief may do to the defendant; and 4) the granting of the relief will not disserve the public interest. *Mississippi Power and Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1987). Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the mov-

---

8. The properties initially considered to lie within the APE included Sterling Grove National Historic District, Charles H. Mouton House, the Evangeline Hotel, Caffery House, Heymann Department Store, Sans Souci, Good Hope Hall, N.P. Moss School, Trappey's Plant Complex, the Wallis Estate, and Arceneaux House. FEIS, Vol II, at 9. The proper-ties carried forward for further consideration included the Sterling Grove Historic District, the Wallis Estate, and Trappey's Plant Complex. FEIS, Appendix E, at 7. Only the Sterling Grove Historic District was determined to be "adversely affected" under the NHPA regulations. *Id.*

ant, by a clear showing, carries the burden of persuasion." *Holland America Insurance v. Succession of Roy,* 777 F.2d 992, 997(5th Cir.1985).

As discussed in the previous sections, based on its review of the administrative record, the Court has determined that no genuine issues of material fact exist as to plaintiff's claims that FHWA violated federal law or its own regulations in reaching the decision to construct the I–49 Connector. Therefore, having found that plaintiffs cannot succeed on the merits, the Court need not give further analysis to plaintiff's request for injunctive relief. Plaintiff's request for injunctive relief will be denied.

### Conclusion

This Court certainly does not fault those members of the Concerned Citizens Coalition for bringing this matter to Court. Indeed, in our Constitutional Republic it is not only their last, but their only resort to redress their grievances.

The issue before the Court, however, is not whether the undersigned judge would have placed the proposed Interstate 49 as it will traverse Lafayette where it was placed; he would not have. Nor is the issue before the Court whether or not the Concerned Citizens Coalition, its members and those individuals and businesses that will be affected by the proposed Interstate 49 and the detrimental changes that it will bring to their neighborhoods and their lives feel aggrieved; they should. Neither is the issue before the court, whether or not most people in Lafayette would be in favor of or opposed to the proposed interstate highway had they made the tour of its "footprint" that the Court made with the attorneys for the parties on May 25, 2004. That there will be drastic changes

in appearance and functionality occasioned by the construction of the interstate is without question.

The sole and only issue before this Court is whether the record of the Federal Highway Administration's decision, limited by the standard of review prescribed by the Administrative Procedures Act, i.e. errors of law or the absence of reasoned consideration in the record, supports the conclusion reached by the Agency. This Court's analysis is confined to only a thorough examination of the of the administrative record. This Court may not substitute its own judgment for that of the Federal Highway Administration. Under the Administrative Procedures Act, this Court must defer to the Federal Highway Administration's interpretation of its own rules so long as that interpretation is reasonable. The agency's interpretation of its rules need only be reasonable, and not the only interpretation or the one the court would have reached if it was initially faced with the question. The Federal Highway Administration's interpretation of the law and of its own rules must be afforded controlling weight unless it is plainly erroneous or inconsistent.

Contrary to some public misconception, it must be remembered that those of us who wear judicial robes are human beings, and as persons are inspired and motivated by compassion as anyone should be. Consequently we often must remind ourselves that in our official capacities we have authority only to issue rulings within the narrow parameters of the law and the facts before us. The temptation to go about doing good where we see fit, regardless of the law, is sometime strong. But the law, *without which judges are nothing,* abjures such unlicensed formulation of unauthorized social policy by the judiciary.[9]

9. *See Bechtold v. Physicians Health Plan of Northern Indiana, Inc.,* 19 F.3d 322, 325 (7th Cir.1994), citing *Harris v. Mutual of Omaha* *Cos.,* 1992 WL 421489, 1992 U.S. Dist. LEXIS 21393 (S.D.Ind. Aug. 26, 1992), *aff'd,* 992 F.2d 706 (7th Cir.1993).

## ORDER

In accordance with the foregoing Memorandum Ruling issued this date,

IT IS ORDERED that the motion for summary judgment filed by Federal Highway Administration [Rec. Doc. 13] is GRANTED; the cross-motion for summary judgment filed by Concerned Citizens Coalition [Rec. Doc. 16] is DENIED, and all of plaintiff's claims are DISMISSED WITH PREJUDICE.