[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14656

_____

CITY OF NORTH MIAMI,

Petitioner,

*versus*

FEDERAL AVIATION ADMINISTRATION,
STEPHEN M. DICKSON,
in his official capacity as Administrator, Federal Aviation Administration,

Respondents.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FONSI / ROD

_____

_____

No. 20-14662

_____

VILLAGE OF INDIAN CREEK, FL,
TOWN OF SURFSIDE, FL,
CHARLES W. BURKETT,

Petitioners,

*versus*

FEDERAL AVIATION ADMINISTRATION,
STEPHEN M. DICKSON,
in his official capacity as Administrator,
Federal Aviation Administration,

Respondents.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FONSI / ROD

_____

20-14656                Opinion of the Court                3

_____

No. 20-14674

_____

VILLAGE OF BISCAYNE PARK, FL,
a Florida municipal corporation,

Petitioner,

*versus*

STEPHEN DICKSON,
Administrator, United States of America
Federal Aviation Administration,

Respondent.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FONSI / ROD

_____
_____

No. 20-14677

_____

4                    Opinion of the Court                    20-14656

CITY OF NORTH MIAMI BEACH,
VILLAGE OF NORTH BAY VILLAGE,
FRIENDS OF BISCAYNE BAY,
MAUREEN HARTWITZ,

                                                      Petitioners,

*versus*

FEDERAL AVIATION ADMINISTRATION,
STEPHEN M. DICKSON,
in his official capacity as Administrator, Federal Aviation Admin-
istration,

                                                      Respondents.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FONSI / ROD

_____

_____

No. 20-14689

_____

20-14656                Opinion of the Court                5

TOWN OF BAY HARBOR ISLANDS,

                                                    Petitioner,

*versus*

FEDERAL AVIATION ADMINISTRATION,
ADMINISTRATOR, FAA,
STEPHEN M. DICKSON,
in his official capacity as Administrator,
Federal Aviation Administration,

                                                    Respondents.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FONSI / ROD

_____

Before NEWSOM, MARCUS, Circuit Judges, and MIDDLEBROOKS,*
District Judge.

MARCUS, Circuit Judge:

_____

* Honorable Donald M. Middlebrooks, United States District Judge for the
Southern District of Florida, sitting by designation.

Just as it did in many other metro areas around the country, the Federal Aviation Administration ("FAA") recently designed and implemented new navigation procedures for flights taking off from and landing in the South-Central Florida Metroplex, whose major airports include Miami International, Ft. Lauderdale-Hollywood International, Palm Beach International, Tampa International, and Orlando International.  These new procedures (referred to as "the Project") made it possible for more planes to safely use the limited airspace and simplified air traffic control procedures.

Petitioners, a group comprised of municipalities, individuals, and a nonprofit organization all based in South Florida, filed this petition for review, claiming that the FAA violated the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Department of Transportation Act, 49 U.S.C. § 101 *et seq.*; and the U.S. Constitution's Due Process Clause.  Among other things, Petitioners say the FAA's Purpose and Need Statement was seriously deficient in violation of NEPA; its Cumulative Impact Assessment was improper and violated NEPA; it relied on a presumption of conformity for air quality analysis in violation of the Clean Air Act and NEPA; it violated Section 4(f) of the Department of Transportation Act by failing to consult with *all* relevant state and local officials regarding the impact of its Project on certain resources; and, finally, it violated the Fifth Amendment by infringing upon an alleged right to sleep without due process.

20-14656                Opinion of the Court                7

As we see it, none of the Petitioners' claims have merit.  The FAA scrupulously adhered to the requirements of the relevant statutes and afforded the public numerous opportunities to comment on the proposed changes.  Accordingly, we **DENY** the petition for review.

I.

The FAA is tasked by Congress with ensuring safe air travel throughout the United States.  49 U.S.C. § 40101 *et seq.*  Under this authority, the FAA publishes air traffic control procedures, including where to turn, what direction to fly, when and where to ascend or descend, and at what speeds.  In 2003, Congress passed the Vision 100 – Century of Aviation Reauthorization Act of 2003 ("Vision 100 Act"), Pub. L. No. 108-176, 117 Stat. 2490 (2003), which directed the FAA to implement the Next Generation Air Transportation System ("NextGen").  One aspect of this modernization effort involves transitioning from ground-based radar navigation systems to satellite-based navigation systems in order to make flight paths more efficient, remedy airspace congestion, and simplify air traffic control procedures.  FAA, *South-Central Florida Metroplex*, http://www.faa.gov/newsroom/south-central-florida-metroplex (last accessed July 11, 2022).

Congress has mandated the expeditious implementation of NextGen and required its implementation at thirty-five of the nation's busiest airports -- including several of the airports at issue here -- within four and a half years.  *See, e.g.*, FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 213(a)(1)(A), (2), 126

Stat. 11, 46–48 (2012).  The FAA was required to design and implement new "Area Navigation" procedures, or "RNAV" procedures, for South-Central Florida and 10 other metroplexes.  *See* FAA, *South-Central Florida Metroplex*.  Each of the other RNAV modernization projects that were challenged in federal courts of appeals has survived judicial review.  *See, e.g.*, *Lyons v. FAA*, 671 F. App'x 674, 674 (Mem.) (9th Cir. 2016) (rejecting challenge to Northern California Metroplex on the merits); *Vaughn v. FAA*, 756 F. App'x 8, 11 (D.C. Cir. 2018) (rejecting challenge to Southern California Metroplex on the merits); *Citizens Ass'n of Georgetown v. FAA*, 896 F.3d 425, 436 (D.C. Cir. 2018) (dismissing Washington, D.C. Metroplex challenge as an untimely filing); *Arapahoe Cnty. Pub. Airport Auth. v. FAA*, 850 F. App'x 9, 10 (Mem.) (D.C. Cir. 2021) (dismissing Denver Metroplex challenge for lack of standing).

The FAA conducted an extensive public outreach program for the Project.  Thus, in April and May 2019, the FAA held public workshops to solicit input on potential designs for the Project, including four in-person workshops and one virtual workshop in the Miami area.  Further, in July 2019, the FAA sent a letter announcing its plans for the Project to 590 federal, state, regional, and local agencies, elected officials, and tribes, and the FAA published a legal notice in English and Spanish in six newspapers.

The FAA also prepared a draft environmental assessment evaluating the Project's potential impact under NEPA, distributed the draft widely, and solicited public comments on the draft from May 2020 to July 2020.  In June 2020, the FAA hosted twelve virtual

workshops to give the public opportunities to learn about the Project and to ask the FAA questions about the Project and the draft environmental assessment. Finally, in October 2020, the FAA issued its Final Environmental Assessment, Finding of No Significant Impact, and final decision adopting new flight procedures. Admin. Rec. ("AR") 3 at 1, 5, 17.

Petitioners timely filed five petitions for review challenging the Florida Metroplex Project, and we consolidated them.[1]

## II.

We start with some general principles. We review the FAA's final decision under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* "Specifically, the standard is whether the [agency action] is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)) (quotation marks omitted); *see also*

---

[1] Several petitions for review are consolidated here. The first set of Petitioners, the "Consolidated Petitioners," are comprised of five municipalities in the South Florida area (the City of North Miami, the Village of Indian Creek, the Town of Surfside, the Village of Biscayne Park, and the Town of Bay Harbor Islands) and Charles Burkett, an individual. The second set of Petitioners, the "North Miami Beach Petitioners," are two municipalities in South Florida (the City of North Miami Beach and the Village of North Bay Village), a nonprofit, and a local resident, Maureen Harwitz. The Consolidated Petitioners have adopted all of the arguments made by the North Miami Beach Petitioners, and the North Miami Beach Petitioners, in turn, have adopted all of the arguments made by the Consolidated Petitioners, except their constitutional sleep claim.

*City of Oxford v. FAA*, 428 F.3d 1346, 1351 (11th Cir. 2005) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375–76 (1989)) ("[F]ederal courts apply the 'arbitrary and capricious' standard, as opposed to the 'reasonableness' standard, when reviewing final agency decisions under the Administrative Procedure Act."). This standard of review is "exceedingly deferential" and provides the reviewing court with limited discretion to reverse an agency's decision. *Miccosukee Tribe of Indians*, 566 F.3d at 1264 (quotation marks omitted). The reviewing court may not substitute its own judgment for that of the agency but must, instead, generally defer to the agency's technical expertise. *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990).

We may, however, find an agency action arbitrary and capricious where

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## A.

We begin with Petitioners' claim that the FAA's Purpose and Need Statement was impermissibly narrow. Specifically, they

say the Purpose and Need of the Project was defined "so narrowly that only one alternative -- the proposed flight procedures -- could fill that purpose." Appellants' Consol. Br. at 45.

NEPA's only requirement regarding the Purpose and Need Statement is that it "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012) (quoting 40 C.F.R. § 1502.13) (quotation marks omitted). Congress explained the aims of the NextGen Air Transportation System, the project at issue here, in the Vision 100 Act:

> (c) Goals.-- The Next Generation Air Transportation System shall—
>
> (1) improve the level of safety, security, efficiency, quality, and affordability of the National Airspace System and aviation services;
>
> (2) take advantage of data from emerging ground-based and space-based communications, navigation, and surveillance technologies;
>
> (3) integrate data streams from multiple agencies and sources to enable situational awareness and seamless global operations for all appropriate users of the system, including users responsible for civil aviation, homeland security, and national security;

(4) leverage investments in civil aviation, homeland security, and national security and build upon current air traffic management and infrastructure initiatives to meet system performance requirements for all system users;

(5) be scalable to accommodate and encourage substantial growth in domestic and international transportation and anticipate and accommodate continuing technology upgrades and advances;

(6) accommodate a wide range of aircraft operations, including airlines, air taxis, helicopters, general aviation, and unmanned aerial vehicles; and

(7) take into consideration, to the greatest extent practicable, design of airport approach and departure flight paths to reduce exposure of noise and emissions pollution on affected residents.

Vision 100 Act, § 709(c).

In its Final Environmental Assessment, the FAA described the Purpose and Need of the Project this way: "to provide for the efficient use of airspace, to develop plans and policy for the use of the navigable airspace, and to assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." AR 5 at 2-1–2-2. The FAA also underscored the importance of safety and integrating the latest technologies, such as RNAV-based design. *Id.*

Petitioners fault the FAA for failing to include the reduction of noise and emissions, to the greatest extent practicable, in its Purpose and Need Statement, even though these considerations are listed among the seven goals of the NextGen program. Vision 100 Act, § 709(c)(7).

We've said that "agencies must look hard at the factors relevant to the definition of purpose." *Citizens for Smart Growth*, 669 F.3d at 1212 (cleaned up) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)). Relatedly, "an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." *Citizens Against Burlington, Inc.*, 938 F.2d at 196. But other than appealing to the general rule that agencies must consider the views of Congress, as expressed in the agency's statutory authorization, Petitioners identify no law or precedent that would compel the FAA, in its statement of Purpose and Need, to account for *each and every one* of Congress's goals for the NextGen project.

To the contrary, our courts afford agencies deference in defining the aims of their projects. *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 14–15 (D.D.C. 2016). "That is, as long as the agency 'look[s] hard at the factors relevant to the definition of purpose,' we generally defer to the agency's reasonable definition of objectives." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (alteration in original) (citation omitted); *see also Citizens for Smart Growth v. Peters*, 716

F. Supp. 2d 1215, 1223 (S.D. Fla. 2010), *aff'd*, 669 F.3d 1203 (11th Cir. 2012) (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)) ("Courts evaluate the reasonableness of an agency objective 'with considerable deference to the agency's expertise and policy-making role.'").

The FAA's decision to list most, but not all, of Congress's objectives in its Purpose and Need statement was not arbitrary or capricious in violation of NEPA. Congress's complex web of statutes regulating noise and emissions expresses broad goals, but none of those statutes compels the FAA to prioritize noise and emission reduction in *all* of its projects. Indeed, it is within the sound discretion of the agency to determine which of Congress's goals this particular project should accomplish. *See Mass. v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."). It bears repeating that Congress outlined broadly seven goals in the Vision 100 Act, and at least the following five were mentioned in the FAA's Purpose and Need Statement: improving efficiency, harnessing new technologies, supporting the growth of transportation, reducing operational errors, and leveraging additional data to ease air traffic controllers' workload. AR 5 at 2-1–2-2.

Petitioners' follow-on argument that, because the Purpose and Need Statement omits mentioning noise and emission reduction, the selection of a particular outcome was a preordained conclusion necessarily fails. The FAA considered two options here --

the Project and no action at all.  Petitioners' claim that the FAA failed to consider alternatives that accomplished noise and emission reduction presupposes that we hold that the FAA must have mentioned those objectives in its Purpose and Need Statement. *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 (citation omitted) ("[W]e will reject an 'unreasonably narrow' definition of objectives that compels the selection of a particular alternative.").  But we conclude that the FAA need *not* have mentioned noise and emission reduction in its Purpose and Need Statement.

Further, the FAA did all that NEPA requires.  As we noted in *Citizens for Smart Growth*, "NEPA does not impose any minimum number of alternatives that must be evaluated."  669 F.3d at 1212.  And in *North Buckhead Civic Association*, we found that an environmental impact statement with only two alternatives studied in detail was sufficient.  *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d at 1541–43.  Of course, the FAA could have studied more alternatives, but they quickly rejected those that didn't meet paramount criteria, such as safety.  AR 20 at 29, 32.

Finally, as discussed at length below, *see infra* Part II.B–D., the FAA considered noise and emissions reduction in detail, and in conformity with the stated Congressional goals.

## B.

Second, Petitioners argue that the FAA also violated NEPA by incorrectly calculating the cumulative impact of its actions on the environment.  In assessing the marginal change in noise from

implementing the NextGen system in the South-Central Florida Metroplex, the FAA used the 2017–2018 period as its baseline. Petitioners say this undercounted the effects of the FAA's pre-2017 actions, and that the FAA should have instead used the 2006 noise levels as a baseline.

Two provisions -- one statutory, one regulatory -- guide our analysis here. First, the National Environmental Policy Act, which is largely a procedural statute. 42 U.S.C. § 4321 *et seq.* It directs all of the agencies of the federal government to, among other things:

> (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
>
> (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

20-14656          Opinion of the Court          17

> (i) the environmental impact of the proposed action . . . .

42 U.S.C. § 4332. And one of NEPA's implementing regulations obligates an agency to consider cumulative impact, rather than merely the impact of the action at hand. 40 C.F.R. § 1508.7. Section 1508.7 of the NEPA regulations define "cumulative impact" as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.*[2]

Second, FAA Order 1050.1F § 4-2(d)(3) echoes this regulation and adds, "[i]f the proposed action would cause significant incremental additions to cumulative impacts, an EIS [environmental

---

2 The Council on Environmental Quality recently updated the NEPA regulations at 40 C.F.R. Parts 1500–1508. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the FAA's NEPA process started before September 2020, *see, e.g.*, AR 30 (draft environmental assessment, dated May 11, 2020), the agency chose to apply the prior regulations, and we cite the prior regulations applicable to the FAA's order. *See* 40 C.F.R. § 1506.13 (explaining that the revised regulations apply "to any NEPA process begun after September 14, 2020," but that "[a]n agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020").

impact statement] is required." "This requirement prevents a proponent from breaking a proposal into small pieces that, when viewed individually, appear insignificant but that are significant when viewed as a whole." *City of Oxford*, 428 F.3d at 1353.

Here, the FAA established a noise baseline using 1,741,841 flights in the South-Central Florida Metroplex region from June 1, 2017 to May 30, 2018 (which were all the flights that the FAA's radar detected in that timeframe). The FAA then modeled noise for both alternative plans (action and no-action) in 2021 and 2026. Based on this modeling, the FAA concluded that the Project will not have a significant noise impact. FAA Order 1050.1F defines a significant impact from the Proposed Action as an increase of Day-Night Level ("DNL") noise by 1.5 decibels at noise-sensitive land use locations (e.g., residences, schools, etc.) that are exposed to aircraft noise of DNL 65 decibels or higher. Further, the Final EA concluded that no population would experience an increase in "reportable noise," even when looking at areas with noise exposure levels between DNL 60 to 65 and DNL 45 to 60.

But Petitioners say that starting from 2017–2018 is the wrong baseline because it ignores FAA actions in 2006, 2015, and 2018 and therefore creates the false impression that the cumulative impact of the FAA's actions will not significantly increase noise in the South Florida area.

A cumulative impact analysis must identify

(i) the area in which the effects of the proposed project will be felt; (ii) the impact expected in that area; (iii) those other actions -- past, present, and proposed, and reasonably foreseeable that *have had or will have impact in the same area*; (iv) the effects of those other impacts; and (v) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) (cleaned up) (emphasis added). Because the 2006, 2015, and 2018 actions had no legally significant impact on noise levels, the FAA argues it did not need to incorporate them in its baseline measurement. We agree.

The first action Petitioners want included in the FAA's baseline came in 2006, when the FAA replaced certain existing flight procedures with satellite-based navigation procedures. But the satellite routes were overlaid on top of the existing flight procedures, and Section 331g of Order 1050.1E contains a categorical exclusion for the establishment of RNAV systems that "use overlay of existing procedures." *See* FAA Order 1050.1E § 311g.[3]

Next, in 2015, the FAA added maximum altitudes to flight charts at the request of air traffic control, without changing any flight procedures. Petitioners make no effort to explain how this

---

[3] The previous version of Order 1050.1F was Order 1050.1E, and it was in place from 2006 through 2015. *See* FAA, *Order 1050.1E, Chg. 1*, http://www.faa.gov/documentLibrary/media/Order/1050.1E.pdf (last accessed July 15, 2022).

change had any on-the-ground effects or "will have impact[s] in the same area" as the Metroplex project.  *Sierra Club*, 827 F.3d at 49.

Last, in 2018, the FAA established sixteen high-altitude flight procedures over land, modified seven high-altitude procedures over land, created forty-two high-altitude procedures over the ocean, and amended two high-altitude procedures over the ocean. *See* Establishment and Modification of Area Navigation Routes, Florida Metroplex Project, 83 Fed. Reg. 54,864 (Nov. 1, 2018); AR 1024 at 19–20.  In the Federal Register, the FAA noted that "this action . . . in support of the Florida Metroplex Project qualifies for categorical exclusion under the National Environmental Policy Act" because it involves "new or revised air traffic control procedures conducted at 3,000 feet or more above ground level."  *Id.* at 54,866.  Petitioners seem to acknowledge this fact, saying that, "[a]lthough these did not include approaches and departures, they had an indirect effect on approaches and departures."  Appellants' Consol. Br. at 49.  But they offer no additional detail about how this "indirect effect" affected noise levels.

In sum, none of the prior actions had a legal impact on noise levels in the area because they were either subject to categorical exclusions or did not change flight procedures.  The FAA's 1050.1F Desk Reference on Cumulative Impact Analysis notes that "FAA has discretion to determine whether, and to what extent, information about the specific nature, design, or present impacts of a past action are useful for the analysis of the impacts of the proposed action and alternative(s)."  FAA 1050.1F Desk Reference (V2), at

15-1 (Feb. 2020).  We cannot say the FAA's exercise of that discretion was arbitrary or capricious.

## C.

Third, Petitioners charge that the FAA violated the Clean Air Act and NEPA when it failed to evaluate the Project's true air quality impact.  The FAA relied on a complex regulatory framework in the process of determining that the effects of the project were entitled to a "presumption of conformity" with environmental laws, but Petitioners claim the FAA wasn't entitled to any such presumption.  *See* Federal Presumed to Conform Actions Under General Conformity, 72 Fed. Reg. 41,565, 41,566 (July 30, 2007).

By way of background, the Clean Air Act includes a program to control the nation's air pollution by setting national ambient air quality standards ("NAAQS").  42 U.S.C. § 7409(a)(1)(A).  Under the Act, the Environmental Protection Agency ("EPA") must establish NAAQS for certain pollutants.  *Id.*  Each state must adopt and submit to EPA for approval a state implementation plan ("SIP") that provides for the implementation, maintenance, and enforcement of the NAAQS in a designated air quality region.  *Id.* § 7410(a)(1).  Moreover, federal agencies may not "approve[] any activity which does not conform to [a SIP] after it has been approved or promulgated . . . ."  42 U.S.C. § 7506(c)(1).  "Conformity" to a SIP generally means that the anticipated emissions from a proposed activity will not frustrate a SIP's purpose of attaining the NAAQS.  *Id.* § 7506(c)(1).

The EPA has promulgated regulations to help federal agencies determine whether their actions conform with SIPs. *See* 40 C.F.R. § 93.150 *et seq.* However, the FAA need not perform a conformity analysis on certain exempt actions that result in no emissions increases or increases that are clearly *de minimis*. *Id.* § 93.153(c)(2); *see also* Federal Presumed to Conform Actions Under General Conformity, 72 Fed. Reg. at 41,566.

Here, the FAA made use of two presumptions: (1) for modifications to flight routes and procedures at or above 3,000 feet above ground level, and (2) for changes to flight paths below 3,000 feet when those changes are designed to improve operational efficiency. As for the first presumption, Petitioners claim "the Final EA provides no factual support for the conclusion that the operational changes associated with the proposed action will occur exclusively, or even preponderantly, at or above 3,000 feet AGL." Appellants' Consol. Br. at 55. They say this is so because the Final EA notes that the Project would "change air traffic flows during departures, descents, and approaches of flights." *Id.*

We are not persuaded. The FAA concluded that the operational changes *likely to result in a change in emissions* will occur at or above 3,000 feet. Where the emissions will occur is relevant because the FAA's presumption is based on the determination that "aircraft emissions released into the atmosphere above" 3,000 feet "do not have an effect on pollution concentrations at ground level." Federal Presumed to Conform Actions Under General Conformity, 72 Fed. Reg. at 41,578. So, although the Project may result

in some changes to on-the-ground procedures, the FAA permissibly found that the changes in emissions -- the relevant metric -- will occur at or above 3,000 feet above ground level and warranted a presumption of conformity.

Petitioners also challenge the FAA's use of the second presumption for changes below 3,000 feet when those changes "to routes and procedures are designed to enhance operational efficiency (i.e., to reduce delay), increase fuel efficiency, or reduce community noise impacts by means of engine thrust reductions." *Id.* They say this presumption should not apply "because FAA is attempting to apply the Presumption of Conformity to a Project that will increase fuel burn, and, consequently, decrease efficiency." Appellants' Consol. Br. at 58 (emphases removed). Although the FAA concedes fuel burn will increase (by less than half a percent), *see* AR 20 at 15, Petitioners' argument defines "efficiency" too narrowly, and is therefore misplaced.

As the FAA explains,

in determining that air traffic control activities have negligible air quality impacts, FAA defined efficiency more broadly as "reducing congestion, balancing controller workload, and improving coordination between controllers handling existing air traffic." 72 Fed. Reg. at 41,578. . . . [T]he Project falls squarely within that definition because it decreases the frequency of controller-pilot communication, reduces controller and pilot workload by decreasing the complexity of flight procedures, reduces the need for

flight path adjustments, and creates more predictable traffic flows. *E.g.*, AR 5 at 2-16, AR 20 at 4. The slight increase in fuel burn does not negate or outweigh the substantial improvements in efficiency that the Project brings to the Florida airspace.

Appellee's Br. at 40. Petitioners have offered no response to the FAA's broader definition of efficiency in their reply brief. They merely repeat that fuel burn will increase. That is factually accurate, but legally insufficient. Because the changes occurring below 3,000 feet above ground level are designed to increase operational efficiency, their effects on the environment are entitled to a presumption of conformity with SIPs.

Finally, Petitioners say that, even if we assume that the Project complies with SIPs and does not violate the Clean Air Act, NEPA requires the FAA to determine whether the action "[i]s not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment." 40 C.F.R. § 1501.3(a)(2). But the FAA defines a "significant" air quality impact under NEPA as one that "would cause pollutant concentrations to exceed one or more of the National Ambient Air Quality Standards (NAAQS), as established by the Environmental Protection Agency under the Clean Air Act." Order 1050.1F at 4-4. Here, the Project would not likely do so. Therefore, the FAA's Clean Air Act analysis showing that the Project would have only a *de minimis* impact on air quality satisfies NEPA, too.

**D.**

Petitioners also allege that the FAA violated Section 4(f) of the Department of Transportation Act by (1) failing to consider the impact of its Project on *all* public parks, recreation areas, and wildlife refuges in and around Biscayne Bay, and (2) failing to consult with *all* local, state, and federal officials with jurisdiction over the affected areas.

Section 4(f) of the Department of Transportation Act prohibits "use" of certain public lands, like Biscayne Bay, unless the agency finds that two conditions are met -- (1) that there is no "prudent and feasible alternative" to use of the land, and (2) that the project minimizes any resulting harm to the resource. 49 U.S.C. § 303(c). Here, the FAA's "use" of Biscayne Bay is a non-physical one -- specifically, the production of noise -- which can be considered a "constructive use" if it substantially impairs the resource. *See* Order 1050.1F at 4-6, B-11. The significance threshold for noise under Section 4(f) is the same as the threshold under NEPA. An action is significant enough to constitute a "use" if it "would increase noise by DNL 1.5 dB or more for a noise sensitive area that is exposed to noise at or above the DNL 65 dB noise exposure level, or that will be exposed at or above the DNL 65 dB level due to a DNL 1.5 dB or greater increase, when compared to the no action alternative for the same timeframe." Order 1050.1F at 4-8.

The FAA also examined potential impact in more noise-sensitive areas. It categorizes an increase of DNL 3.0dB or more as significant when it occurs in an area with a noise exposure level between DNL 60 and 65 dB. After a thorough analysis, the FAA

concluded the Project would *not* cause a significant increase in noise at any of the areas it examined.

Petitioners lob a number of objections at the FAA's analysis. First, they say the Section 4(f) analysis "did not address all public parks, recreation areas, and wildlife refuges in and around Biscayne Bay." Specifically, they claim the "Biscayne Bay Aquatic Preserve" was omitted. The Florida Department of Environmental Protection defines that Preserve as "run[ning] the length of Biscayne Bay proper, from the headwaters of the Oleta River down to Card Sound near Key Largo." Fla. Dep't of Env't Pres., *Biscayne Bay Aquatic Preserves*, http://www.floridadep.gov/BiscayneBayAP (last accessed July 15, 2022).

The entire length of Biscayne Bay is surely covered by the FAA's other, extensive analysis. The FAA generated grid points spaced every 0.5 nautical miles for all Project areas where planes would be flying under 18,000 feet. Then, the FAA modeled the noise at the grid points pre-Project (the baseline) and post-Project (after implementing the Project's flight route changes) for two separate years, 2021 and 2026. It found that the Project would not cause a significant increase in noise at any of the more than 94,000 Section 4(f) resource points or at any of the 0.5 nautical mile grid points. So, even if the FAA did not specifically enumerate the Biscayne Bay Aquatic Preserve, it nonetheless ensured the Preserve would not suffer a significant increase in noise. Absent a showing by Petitioners that the FAA has violated its regulations in some

way, their claim is insufficient to establish that the FAA's 4(f) analysis was arbitrary and capricious.

Next, Petitioners say the FAA's assessment of potential use was flawed because "there is no evidence the agency properly considered whether" the protected areas "might be 'substantially impaired' by the Project." This is not accurate. There is ample record evidence of the methodology the FAA used to map the areas that may be affected under Section 4(f) and to conclude that there would be no significant increase in noise. *See generally* AR 19.

The Petitioners also complain that the FAA only used Day-Night Level to evaluate noise levels and that, under the FAA's Section 4(f) procedures, "general thresholds are not sufficient to determine noise compatibility for noise-sensitive Section 4(f) resources." In support of this argument, Petitioners cite to the FAA's 1050.1F Desk Reference's discussion of Section 4(f). There, the FAA writes that

> The FAA *may* use the part 150 land use compatibility table as a guideline to determine the significance of noise impacts on Section 4(f) properties to the extent that the land uses specified bear relevance to the value, significance, and enjoyment of the lands in question. However, the part 150 guidelines *may* not be sufficient for all historic sites as described above, and the part 150 guidelines do not adequately address the impacts of noise on the expectations and purposes of people visiting areas within a national park or national wildlife refuge where other noise is very low

and a quiet setting is a generally recognized purpose
and attribute.

AR 1541 at 5-7 (emphasis added).  Even under a Petitioner-friendly
interpretation of this provision, the FAA could choose to apply the
standard noise thresholds to noise-sensitive areas *if* it determined
that it was appropriate to do so.  *See id.* ("The FAA may use the
part 150 land use compatibility table as a guideline . . . .").

What's more, the FAA did in fact use different thresholds for
noise-sensitive areas, rather than just applying the part 150 guide-
lines referenced in the Desk Reference to all areas.  Instead of look-
ing for increases of 1.5 dB or more at overall DNL levels at or above
65 dB, it looked for DNL increases of 3.0 dB at the 60–65 dB level
and a DNL increase of 5.0 dB at the 45–60 dB level.  AR 3 at 8–9;
AR 5 at 5-6; AR 1541 at 11-9.  Petitioners' vague argument that
"something more than a mechanistic review" of DNL estimates is
necessary, without specifying what that something more might be,
in noise-sensitive areas both fails as a matter of law and ignores the
record.

Petitioners' last Section 4(f) argument is that the FAA failed
to adequately consult with *all* state and local agencies about poten-
tial noise impact on Section 4(f) resources.  Section 4(f) itself says
nothing about consultation with local officials.  Instead, the FAA's
implementing regulation, Order 1050.1F, provides that the "re-
sponsible FAA official must consult all appropriate Federal, state,
and local officials having jurisdiction over the affected Section 4(f)
properties when determining whether project-related impacts

would substantially impair the resources." Order 1050.1F at B-11. Order 1050.1F does not prescribe any particular process or manner in which the FAA must conduct this consultation, however.

The FAA sent notice to all the local government Petitioners in this case; it followed general notice-and-comment procedures; and it conducted twelve public workshops. But the Petitioners say this is insufficient. They claim that the FAA did not consult specifically with the Florida Department of Environmental Protection about the Biscayne Bay Aquatic Preserve. Further, they say that general consultation is not enough -- the FAA needed to seek the input of state and local officials on the topic of Section 4(f).

Petitioners' arguments fail, both as a matter of fact and of law. First, the FAA did indeed reach out to the Florida Department of Environmental Protection. AR 11 at 77. Both the Secretary of the Florida Department of Environmental Protection, Noah Valenstein, and the Director of the Office of Resilience and Coastal Protection at the Florida Department of Environmental Protection, Kevin Claridge, were on the FAA's mailing list for its Notices of Availability of its draft environmental assessment. *Id.* These Notices alerted their recipients to the workshops the FAA was hosting on the draft environmental assessment for the South-Central Florida Metroplex Project. *Id.* The letters sent to the Florida Department of Environmental Protection listed twelve total workshops that were open to the public, three of which focused on the Miami area -- where the Biscayne Bay Aquatic Preserve is located.

Petitioners say this is still not enough.  They argue Section 4(f)'s consultation "mandate requires specific participants to exchange views on a specific subject at a specific time."  North Miami Beach Reply Br. at 6.  No case law supports this onerous requirement, and neither does the text of Order 1050.1F.  The FAA cannot drag all stakeholders to the proverbial consulting table -- it can only set the table and send the invitations.

Petitioners' appeal to *City of Phoenix v. Huerta*, 869 F.3d 963 (D.C. Cir. 2017), is unavailing.  There, the FAA changed satellite-based flight routes, and the City argued the FAA failed to fulfill its consultation obligations under Section 4(f) when it consulted a low-level employee in the City's aviation department who lacked the authority to speak for the City.  *Id.* at 966, 971.  The D.C. Circuit held that the City's failure to consult other local officials was arbitrary because

> it was unreasonable for the agency simply to assume that low-level Aviation Department employees had jurisdiction over the historic sites and public parks protected by section 4(f), much less that these employees (along with the State Historic Preservation Officer) represented *all* the local officials with such jurisdiction, as the agency's consultation duties required.

*Id.* at 973–74. Here, by contrast, the FAA did not attempt to consult with low-level employees; rather, it invited the views of the

Secretary and of the Director of the Office of Resilience and Coastal Protection of the Florida Department of Environmental Protection.

Nor is this a case where the FAA offered "no evidence that [it] ever consulted with the Cities regarding the affected section 4(f) properties the FAA identified." *City of Los Angeles v. Dickson*, No. 19-71581, 2021 WL 2850586, at *2 (9th Cir. July 8, 2021). The FAA's extensive outreach efforts satisfy Section 4(f)'s consultation provision. It provided advance notice of its intent to prepare a draft environmental assessment, and it distributed the notice to more than 200 state and local public officials throughout South Florida, including all the local government Petitioners, along with many federal officials. AR 36 at A-1 to A-16; AR 36 at A-14 (the City of North Miami, Mayor Joseph Smith; *id.* at A-13 (the Village of Indian Creek, Mayor Bernard Klepach; *id.* at A-15 (the Town of Surfside, Mayor Daniel Dietch; *id.* at A-12 (the Village of Biscayne Park, Mayor Tracy Truppman); *id.* at A-14 (the City of North Miami Beach, Mayor Anthony Defillipo); *id.* at A-14 (the Village of North Bay Village, Mayor Brent Latham; *id.* at A-15 (the Town of Bay Harbor Islands, Mayor Stephanie Bruder); *see also* AR 11 at A-1 to A-16 (sending notice of revised project scope); AR 11 at A-27 to A-38 (sending clarification about the Project's scope).

The Petitioners have not identified -- and we have not found -- any other case where a court has granted a petition for review based on the FAA's failure to fulfill its consultation duties under

32                    Opinion of the Court                    20-14656

Order 1050.1F. We think the FAA complied with all of Section 4(f)'s requirements.

## E.

Finally, Petitioners make the long-shot argument that the FAA has deprived them of a constitutionally protected right to sleep. They locate such a right in the Due Process Clause as a substantive "liberty" interest, and they say that the increase in noise will deprive them of that liberty without constitutionally sufficient process. The claim fails for myriad reasons.

To start, the FAA argues that Petitioner Charles Burkett and the Petitioner Towns do not have standing to bring this claim. The three prerequisites for Article III standing are that:

> (1) the plaintiff has suffered an "injury in fact" -- an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there be a causal connection between that injury and the conduct complained of -- the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision.

Corbett v. Transp. Sec. Admin., 930 F.3d 1225, 1232 (11th Cir. 2019) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). The FAA highlights that the petition for review and Burkett's

declaration never mention sleep.  They never allege that the FAA's project has disturbed their sleep, and therefore do not allege an injury in fact -- at least not one that could give rise to a constitutional sleep claim.

In response, Petitioners point to Burkett's declaration stating that the Project has "negatively impacted [his] quality of life and health."  Appellants' Consol. Br., Ex. B ¶ 4.  On its own, that might be insufficient, but Petitioner Burkett also points to his public comments during the notice-and-comment period.  He said, "Surfside has already experienced a noticeable increase in overhead aircraft traffic in the last few years.  This traffic has impacted our quality of life and even has made it difficult to sleep at times.  Please do not increase the noise level or traffic level over Surfside, Florida."  Final EA, Appendix J-2, p.185.  Although this comment is found in the administrative record, rather than in the petition for review or attached declarations, we have held, in a case involving a petition for review, that "if we have been presented with 'facts beyond the four corners' of the pleading that are relevant to the question of standing, we may consider them." *Corbett*, 930 F.3d at 1228 (citation omitted).  Burkett's public comment that air traffic has made it "difficult to sleep" is a concrete, particularized injury, fairly traceable to the FAA, and redressable by a favorable decision from this Court.  Reading the petition for review together with Burkett's public comments, we think Burkett has said just enough to show Article III standing.

The municipality Petitioners, however, cannot establish standing. Their theory of standing is premised on the alleged harm to their residents. By invoking the interests of their residents, the municipalities are attempting to sue the FAA under a *parens patriae* theory. The problem for the municipalities is that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982). And "[a]s municipalities derive their existence from the state and function as political subdivisions of the state, presumably they too cannot sue the federal government under the doctrine of *parens patriae*." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002). *See* Appellants' Consol. Br., Ex. A at 101 ¶ 3, 104 ¶ 3, 107 ¶ 3, 110 ¶ 3, 113 ¶ 3 (explaining that each municipality's authority comes from Florida's Constitution and state laws). Only Burkett has standing to pursue the lack of sleep claim.

But Burkett's claim fails on its merits. He brings a procedural due process claim under the Fourteenth Amendment (which, as he admits in his reply brief, should be the Fifth Amendment because the FAA is an agency of the federal government) alleging that the government has deprived him of a constitutionally protected liberty -- the right to sleep. Putting aside, for the moment, the threshold problem that the federal courts have not recognized a right to sleep in the Due Process Clause, Burkett is entitled to no additional procedural due process here. The FAA's Metroplex Project is clearly legislative, not adjudicative in nature, and "if

government action is viewed as legislative in nature, property own-ers generally are not entitled to procedural due process." *75 Acres, LLC v. Miami-Dade Cnty.*, 338 F.3d 1288, 1294 (11th Cir. 2003); *see also Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020) (emphasis in original) (explaining that when the State deprives per-sons of liberty through the legislative process, "the affected persons are not entitled to *any* process beyond that provided by the legisla-tive process").

We have described legislative action as "general laws that apply to more than a few people," whereas we have described ad-judicative action as concerning "a relatively small number of per-sons who are exceptionally affected, in each case upon individual grounds, by the state action." *Id.* (citation and quotation marks omitted). The Metroplex Project plainly is not an adjudication. The FAA acted pursuant to statutory authorization, planned for a prospective project, and affected the "rights" of tens of millions of people. Thus, Burkett's procedural due process claim fails. But even if Burkett were otherwise entitled to procedural due process about this matter, the only place we have found any reference to a right to sleep is in the Eighth Amendment. *See, e.g.*, *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013); *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). The Petitioners point to no case -- and have we found none -- locating a constitutional right to sleep in substantive due process.

★★★

The FAA engaged in exhaustive study of the South-Central Florida Metroplex Project's impact on the environment and noise levels in the affected area, and it found no significant impact. It also provided ample opportunity for the various stakeholders to learn about and comment on the project, and complied with all procedural requirements.

Accordingly, we **DENY** the consolidated petition for review.